Hello, Brenton Akinhans from the Office of Jury Steering on behalf of Appellant Joshua Gonzalez. So, your honors, what we have here is we have essentially a series of ambiguous facts and factual disputes that were resolved as a matter of law. As the established president of the circuit says, that is a function reserved for the jury. That's not something that the court should be deciding as a matter of law. So, when we have, for example, a request from the officers... Just a minute. What issue are you addressing here? I'm addressing right now the 148 issue. You're addressing whether they had probable cause to believe he'd violated that? Yeah, to believe that he was a fleeing suspect. Well, I mean, juries don't determine this at this particular point in time. I mean, I'm trying to figure out what you're trying to argue. Are you trying to argue that the officers didn't have reasonable suspicion to stop him? Well, I would argue that they had reasonable suspicion, but in the course of his investigation, the facts that he'd become aware of, they did not... Well, if they had reasonable suspicion to stop him, then we go to the second. Did they have probable cause to think that he could be arrested? That's what you're arguing? Yeah, there are a number of interrelated issues here, so I want to focus on... He violated 148A1? I'm sorry? Are you arguing they didn't have probable cause to believe that he violated 148A1? Is that what you're arguing? Yes, Your Honor, that is one of our arguments. I was focusing on that because that's the most clear example of where the court takes some ambiguous facts. Well, just a minute. I just want to make sure. There was a conversation between your client and the officers about whether he was engaged in a trespass, right? Correct. The officers touched his arm, said you're not to go in when told, co-failed to go inside? No, that's not what happened, Your Honor. What he said is he said, come hang out here, man, and then he touched his arm. All right, beckoned him to stay and requested him, come hang out here, man? Yes, he said, come hang out here, man. And he went in there anyway? Well, the officer moments previously actually asked for his identification, and that is actually where our client went. Well, just a minute. He didn't go for his ID. He told him he had to go to York's residence to get his ID. His ID was in York's residence? He was going in Coffell's residence. He wasn't going in York's. He was going into Coffell's and York's? He told the officers he had to go down to York's residence to get his ID, and then he takes off and goes in Coffell's residence. That's not York's. I believe Coffell and York had some sort of a cohabitation arrangement, and his ID was in that house, and it was actually undisputed. Is that in the record? Yes, Your Honor. I don't think so. I mean, I looked very carefully. I tried to say, what about this? He says he has to go to York's, and instead he goes to Coffell's. Why is that not doing something he shouldn't have done? Because both officers were aware that he was going into the house to get his identification. Mr. Hands, on the video, when Mr. Gonzalez walks away, does the officer who had been talking to him and the woman, does he go after him? Does he make any moves? Does he do anything to suggest that Mr. Gonzalez is doing something inappropriate, wrong, or contrary to his directions by walking away? No. He continues talking with Ms. Coffell, and he stays there for a number of minutes before deciding, apparently, that he was going to engage in a pursuit. Now, both officers do admit that he said he was going to get his identification, and that that's what they understood him to be doing. And earlier on the video, doesn't Gonzalez kind of point towards, actually, what turns out to be the camera when he's basically saying, that's where I have to go? Yes. Judge Smith is right. He does voice that way. The thing I wasn't clear on, it goes back to Judge Smith's question about the two different residences. You can't tell because the camera is kind of from that vantage point. Are they right next to each other, or what? I believe that Ms. Coffell and Mr. York were cohabitating, and that Mr. Gonzalez was the boyfriend of Mr. York. And you think that's in the record somewhere? Yeah, I believe so, Your Honor. That is my understanding. I'm sorry, go ahead. If I'm incorrect on that, I will correct myself, but that's my understanding. So him, and as far as what the officers understood at the scene, under the objective circumstances, he said that he was going into his house to retrieve his ID. And that is what they understood, and that is undisputed. That is not undisputed, because that's what I asked you about. It seemed to me he was going to go to York's residence to get his ID, but he didn't go to York's residence. But I understand why you want to make it undisputed, but that's why I was trying to make it obvious that it seems disputed. On the excerpt of record, page 81, paragraph 12, the officer does not dispute that our client said that he was going to get his identification. On page 83, paragraph 17, the appellees also admit, and it's undisputed, that they told Officer Jackson that he went inside to get his identification. That is undisputed, and that's the understanding that they had at the time. Now, the two things you just cited, is that part of the summary judgment briefing? Yes. Okay. That would be the statement of undisputed facts. And that's what they offered to the court. Okay. So, whether you can characterize him walking away, and by the way, it's also undisputed that the officer asked him to retrieve his identification. So, whether you characterize him walking away as fleeing, well, you can't characterize it as just fleeing. That's something that is reserved for the jury. So, the inferences from these facts is a function reserved for the jury. And then we also have this issue, though. Just a minute. That doesn't have anything. What we're trying to figure out is whether these officers could have probable cause. We're not looking at what the jury's going to decide. If these officers had probable cause, then they can do what they needed to do in this situation. And 148A1 says, what you've got to do in order to have this is the defendant's got to willfully resist, delay, or obstruct. When the officer is engaged in the performance of his duties, that the defendant knew or reasonably should have known that the other person was a police officer engaged in the performance of his duties. That's what you've got to have in order to violate 148A1. Kind of a weird statute, but nonetheless, that's where it is. In fact, there was a conversation between your client and the officers about whether he was engaged in a trespass. And if, in fact, the officers touched his arm or said, you're not going to go in when Cofell went in. Or if they beckoned him to stay and told him to hang out there, man, then at that point, it seems it does give probable cause for a violation of 148A1. The dispute here is about the inferences from the facts. So staying, come out here, man, and touching an arm, that does not indicate a show of authority necessarily. That is something that a jury would have to observe that video. And I observed that video. It doesn't look to me in any way that it was a show of authority. It looks to me like it was a friendly pat on the arm. As far as saying, come out here, man, that in itself can't amount to a demand to stay. That sounds like a friendly invitation to stay. And that's how a reasonable person in our client's position could interpret it. And we believe that we are entitled to present that to a jury. Because you cannot say as a matter of law that touching somebody's arm like this amounts to grabbing their arm or trying to impede their movement. You cannot say as a matter of law that telling them to come out here, man, amounts to demanding that they stay. That is a Pele's argument, though. And that's something that the court should not decide as a matter of law, the legitimate inferences from those facts. So it's not disputed that he touched his arm, but the legitimate inferences from that fact, that's something that is reserved for the jury. It should not be resolved as a matter of law. Now, we also have this issue about whether they could actually detain him in the first place past the point in that investigation. Because, as the brief discusses at length, you needed to have specific intent. You need to have evidence of a specific intent to trespass. And under every single one of those sections of 602 relating to trespass, there is a specific intent requirement. That evidence was not present here. In fact, you only have one fact in favor of trespassing, and that's the allegation itself from Mr. Scapputo. It's not corroborated in any way. It's not corroborated by his own statements. It's not corroborated by observing the property. It was rebutted at the scene by our client. There's no fence surrounding his property. And there is, in fact, no backyard to his property. But there was no apparent backyard to his property either. You don't have to look at a plat map in order to see that. It's obvious from the situation the officer is confronted. Even if there's a specific intent requirement, I know the city disputes that, the police are entitled to investigate, to ask questions, to detain him. And that's what the police officer did, detain him to ask questions, to figure out once the police officer gets a call from the concerned citizen. It may not be true, but the police officer, he or she has to investigate. He is certainly entitled to investigate, and of course they should. But that is not carte blanche in order to detain a person indefinitely. And there are facts that they can become aware of in the course of their investigation that can lessen any probable cause or reasonable suspicion that they may have had. So, for example— So isn't part of your argument here that they didn't actually detain him? In other words, this was more of a voluntary conversation as opposed to a detention? That's one facet of it. So, the initial detention—and I'm going to assume that they did have a basis to initially detain him—but after they had started their investigation, they became aware of more facts. Any justification they may have had dissipated. So, again, after you talk with Mr. Scarputo, you find out that he doesn't have a backyard. You see that there is no fence. And our client pointed out the exact location at the scene where he's allegedly standing, and that was in a public alley. None of that is disputed, and what that does is that rebuts the allegations that Mr. Scarputo made. And he had nothing independent of his allegation to corroborate what he said. And that's what the subsequent investigation found, and that's why our client was never charged with that, with trespass. And again, what it says is, it doesn't just say, you know, we looked at the boundary map and we saw that he didn't have property. It was based on the statements that Mr. Scarputo had provided and that our client had provided to the officers. Based off of those statements, there was nothing there that they could charge him with. There was nothing there to justify the trespass charge. So, again, the only fact that we have, the only inculpatory fact we have with regard to trespass is the accusation itself. Now, the— Counsel, you have less than two minutes on it. You know, I'd like to reserve my time for rebuttal. Thank you. John?  Thank you, Your Honor. Good morning, and may it please the Court. Daniel Cha, Senior Deputy City Attorney for the City of Huntington Beach, on behalf of the appellees. And I'd like to start by correcting a few material misstatements that I think Mr. Hans made, perhaps inadvertently. And first is the idea that the York residents and the Coffell residents are one and the same. There is a satellite photograph in the record at ER 101, and that shows the layout of the neighborhood. And from Mr. Gonzalez, the appellant's own deposition testimony, he testified that he told Officer Gonzalez that he was staying that evening at Mr. York's residence and distinguished it from Ms. Coffell's residence. That's at ER 242, his testimony. Ben told Officer Gonzalez that his identification was at Mr. York's residence. That's at ER 345. But as Judge Smith pointed out, he then went into Ms. Coffell's yard. That's at ER 249, and it's visible on the video recordings from the surveillance camera. So I'd like to start with that. And with regards to whether there was a fence surrounding Mr. Scafudo's property, again, I'll direct the court to ER 101. There's clearly a fence visible separating the properties of Mr. Scafudo and Ms. Coffell. I'm looking at that. I'm looking at that right now. Can you just orient me a little bit? The S is the little S is on top of Scafudo's property? Yes. And what's the G? I believe Mr. Gonzalez placed that on Ms. Coffell's property as the place that he was staying most of the time. Okay, and where are you saying there's a fence then? There is a fence separating the S property from the G property. I don't know how well you can see it on the copy that was provided. Well, I've got it on an iPad, and I'm zooming, and I'm – yeah, okay. You're saying there's a fence there? Yeah, you can see the fence easier if you look closer to the waterline. So on that same photo, which one is the Coffell residence? Is it the long kind of rectangular one that's kind of more towards the water than the G? No, the G is the Coffell residence. That is the Coffell residence, okay. And the next one – What building was the camera on that we get the video of? That next building over that's not – The one that's facing the other way kind of at the end of the cul-de-sac? Yes, the one that's all the way at the end. I get it, okay. And that was York's residence. That's York, okay. So a completely different building. And also Mr. Scofudo himself testified at ER 171 to 172 that he exited the gates to his property to go talk to the officers, which necessarily implies the existence of a fence. And so when he tells the officers, this guy was rummaging around in my backyard, which it's not a large yard. It's pretty built out to the property line, but there is a space between his property and the Coffell property, and essentially he considers the waterline to be the front of his property, and that's where the trash cans were kept. He says to the officers, this guy I heard rummaging in my backyard with my trash cans. So what direction do you understand he's calling the backyard to be? So I'm looking at the S. On one side there's water, on one side there's a couple of boats, on the other side there's the G, and then there's something that looks like a park or something like that. So what is it that you think he considers his backyard? The space between his property and the Coffell property. Well, in Chicago we call an alley. We have alleys in Chicago. It's not like California. It's not an alley because that's the property. I get it. I know they don't have alleys in California anyway. I'm just pulling your chain off. Sorry. Yeah, but that's where the fence is that separates his property from the Coffell property. It's narrow, but there's a space there. So he tells the officers, you know, this guy Josh was in my yard, and he was trespassing. And as he says that, Mr. Gonzalez walks down the street, and he points him out, literally points him out and says, that's the guy who was trespassing. So clearly there was at least reasonable suspicion, and actually there was probable cause to believe that he was trespassing because Mr. Scafudo told the officers not only that he was found on his property but that he told him, that he told the appellant, you need to get off my private property, and he said no. He started yelling obscenities and screaming at him, and that's when he went inside and called 911. So that's clearly a trespass under 6020 as well as 602.8. Can you address how Mr. Officer Gonzalez was in hot pursuit? That seems a bit dubious because he stopped to talk to two separate people for at least a couple of minutes. Yes, Your Honor. And with that, I would say that it's a bit curious that the appellant is essentially saying that Officer Gonzalez had to escalate the situation in order to have the right to continue his pursuit of Mr. Gonzalez when I think, especially nowadays, officers are taught to deescalate whenever possible and to turn down the temperature as much as possible in order to avoid escalating emotions and resulting in uses of force that are unnecessary. That argument, I think, maybe applies to Ms. Cofel, who appeared to be a little bit more belligerent, but then he stopped to talk to Mr. Alexander, who appears much more friendly. So maybe that's plausible with the first person, but with the second, with Mr. Alexander, it seems Officer Gonzalez wasn't really in hot pursuit. Well, Your Honor, a couple of things about that.  That was a case where there was an altercation between the suspect and the officer in a rural area, and then the person went down the road. Then the officer waited for 30 minutes for backup before going down the road and then entering onto a private property that they had no idea where the individual had gone to. And in that case, the Ninth Circuit distinguished the hypothetical and said this is not a case where the police officers always knew exactly where the suspect was but decided that it would be dangerous for them to enter the property until reinforcements arrived. Under such circumstances, the continuity of the chase is delayed but not broken. But your argument just stopped you. In those cases, the officers may have known where the suspect was. They were waiting for reinforcements. In this case, that didn't happen. Gonzalez turned his back. Actually, Your Honor, yes. I think as Judge Lee mentioned, Ms. Cofell was the more belligerent of the two individuals who Officer Gonzalez was dealing with. So he initially turned his attention to Ms. Cofell to get her to stop, and then he waited for his partner, Officer Jackson, to come around the corner. So that's what happened when Officer— Why didn't they stop to speak with Alexander or Anderson? They were approaching the gate that Mr. Gonzalez had entered into, and as they did so, they were confronted with a very large man, Alexander, this acquaintance, who came out to talk to them and confront them. And instead of forcibly pushing their way past, they said, hey, we're arresting that guy. You need to let us through. And that's exactly what Mr. Alexander did, and that's when Mr. Gonzalez ran into the home. And contemporaneously, Mr. Alexander was telling Ms. Cofell, and it's heard on the videos, you know, he shouldn't have run in, they have a right to do this, because he understood that that's what the officers were doing. They were following Mr. Gonzalez onto the property because he had committed a 148. Let me ask you to go further. Supposing I think that they needed to wait for a warrant. They needed to go get a warrant. If they're going to let the guy walk away, they're going to talk to two people, they're going to do what they have to do, they have to have a warrant. They can't just rush in and do what they had to do there. At that point, I would say it's probably an unlawful arrest. At that point, you're going to say qualified immunity. Okay, supposing I say, okay, you're right. What do I do about the false arrest on the state charge? Well, Your Honor, I would say that the... If I find there is no reason to arrest, or they should have got a warrant, they shouldn't have had a warrantless arrest, and I also give them qualified immunity, which you also argue, it seems to me at that point, you'd still have to fight the false arrest state charge because officers have no general immunity from claims for false imprisonment. They cannot have a false arrest if it's not based on a... Or you only get a false arrest if it's based on a lawful arrest. So therefore, it seems to me that that would be something that we could not undo on summary judgment. Well, that's correct, Your Honor. I think it's significant that the state courts in California have recognized the applicability of the pursuit exception to jailable misdemeanors, and that's something that we discussed in reference to the Supreme Court's opinion in Stanton v. Sims. And I'd like to point out to the court that recently in October, the Supreme Court granted cert in another case out of California. It's Lange v. California, and that's Supreme Court docket number 20-18, specifically on this issue of whether the pursuit exception applies to misdemeanors. But even if you resolve the federal claim solely on the clearly established prong, the state court cases establish the availability of the pursuit exception. But I've got to find a pursuit exception in order to go there, and there was no destruction of evidence. There's no emergency, nothing about being armed and dangerous. The only way for me to get to that is to say that what happened in this particular situation is exigent circumstances, which did not go away for the fact that they turned and confronted Cofell. They stopped and talked to Anderson, Alexander, whoever it was, and that that did not. In order for me to go with you, I've got to say it's still exigent circumstances. If I say there's no exigent circumstances and you had to go get a warrant, it seems to me the false arrest case in the state claim survives. Well, I would agree, Your Honor, but I would again point out that the Supreme Court in the seminal pursuit case, United States v. Santana, said that a pursuit does not require a hue and cry out in the streets. And as Mr. Gonzalez himself testified, the entire time that it took for the officers to get to the property was less than 30 seconds. And in his own words, it was in the blink of an eye. Well, it was more than 30 seconds because they say one minute to talk to Cofell and then another couple of minutes to talk to Anderson, Alexander, whatever his name is. Well, Your Honor, again, it's the case that Officer Gonzalez was dealing with both the appellant and Ms. Cofell. And when Mr. Gonzalez, the appellant, started walking away, Officer Gonzalez dealt with the more imminent concern in his mind, which was the more aggressively belligerent Shannon Cofell. I'm sorry. Finish your answer. I have one different question. And then they walked into the yard, and then Officer Gonzalez prudently waited for Officer Jackson to come around the corner so that he had backup. And then they both approached the gate. And when they did so, the heretofore unknown large gentleman, Dallas Alexander, comes out, and they take a moment to see if he's going to be cooperative or if he's going to be somebody who's going to get in the way. They secure his cooperation, and then they enter into the yard. And again, that's exactly the kind of situation we want our officers to de-escalate and not to force the issue if it's not necessary. And so it would be an odd incentive to be telling our officers, in order to preserve the pursuit exception, you have to bowl people over and potentially escalate uses of force in situations that don't require it. So earlier on, you gave a couple of record citations, and I'm hoping you might be able to repeat. It's where Mr. Scafudo refers to having gone out his gate and where he refers to having told Mr. Gonzalez. I wasn't writing fast enough to catch this. With the rest of the gates, it's at ER 171 through 172. Got it. And he told the officers about the confrontation with the plaintiff at ER 185. 185. And this gate, is there anything in the record that talks about whether it's a gate to the area that he says that Mr. Gonzalez was in, as opposed to just a gate to his front door? Can you tell that from the record? That much is not specified. Okay. Fair enough. Thanks. And if there are no further questions, Your Honor, we request that the panel affirm the judgment below in its entirety. Thank you. Okay. First of all, Your Honor, counsel was correct. I'd like to just correct something I said earlier. So they weren't living together. Kilfell and York were living next to each other, and he had gone back and forth to both residences. But I don't think that affects the analysis, unless there's any evidence the officers knew that one person owned one residence over the other. So I'd also like to point out that under state law, there is no qualified immunity, as the court had pointed out. And so if this court were to decide that the hot pursuit exception does not apply, but it's a close question, and so the appellees get qualified immunity, for example, that still would not affect the state law claims, and those should be allowed to go forward. So does this court have any further questions about any of the issues that were discussed here? Okay. I think I submit them. Great. The case has been submitted. Thank you again for the helpful argument. Thank you, Your Honor.
judges: N.R. Smith, Kennelly, Lee